JOURNAL-TRIBUNE PUBLISHING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32844.   Filed September 23, 1955.

*John Enrietto*, *Esq.*, and *Frank C. Niswander*, *Esq.*, for the petitioner.

*Harold Weinstock*, *Esq.*, and *James P. Powers*, *Esq.*, for the respondent.

1060

OPINION.

Fisher, *Judge:* The respondent concedes that petitioner qualifies for excess profits tax relief under section 722 (c) of the Internal Revenue Code (1939) and has made a partial allowance of the claims filed by petitioner, as set out in our findings of fact. The parties have stipulated that petitioner's excess profits credit based on invested capital is an inadequate standard for determining excess profits for the fiscal years ended October 31, 1942 to 1945, inclusive, because the business of

petitioner was of a class in which intangible assets not includible in invested capital under section 718 of the Internal Revenue Code, made important contributions to income, and, further, because invested capital was abnormally low. Petitioner's complaint is that the relief allowed by respondent is inadequate and does not reflect the use of a fair and just amount representing its constructive average base period earnings.

The application of section 722 (c) requires the determination of a constructive average base period net income under section 722 (a). The reconstruction procedure is substantially the same as in section 722 (b) (4) involving a change in the character of the business. See Regs. 112, sec. 35.722–4 (c) and the Bulletin on Section 722, p. 136. The fundamental problem before us involves the determination of what petitioner's base period net earnings would have been if the merger of the Journal and Tribune had taken place and petitioner had begun operations two years before December 31, 1939, the end of the statutory base period.

In approaching the problem, we have before us detailed information concerning petitioner's predecessor papers, the Journal and the Tribune, for each of the base period years. We likewise have detailed information establishing the nature and character of petitioner's business from December 29, 1941 (the date on which it began publication of its papers as a consolidated organization), through so much of the post-1939 period as is here material. We have found that its operations reached the level of normalcy about January 1, 1943. While the foregoing, and some of the data, information, and statistics with which the record abounds, are helpful in the solution of the issue, we cannot accept the views urged by either of the parties as determinative, and we must undertake the task of weighing the imponderables inherent in a problem the answer to which depends largely on inference, opinion, and judgment.

Following the merger of the Journal and the Tribune into the Journal-Tribune, there was a shrinkage in circulation, and increase in subscription and advertising rates, and a decrease in expenses. The actual shrinkage in circulation of the daily edition amounted to about 11.66 per cent in the city and 22 per cent in the country. At the same time, there was an increase in the circulation of petitioner's Sunday paper over the circulation of the Sunday Journal. The Tribune did not publish a Sunday edition. The loss in circulation was offset in part by the increase in subscription rates which were put into effect soon after the merger.

Before the merger, the weekly subscription rates for carrier delivery of the dailies were 17½ cents for the Journal and 18 cents for the Tribune. The Journal-Tribune rate at the start was 18 cents but it was raised to 20 cents in September 1942. The combined daily and

Sunday rate of the Journal-Tribune started at 20 cents per week, the same as for the Journal, but was increased to 25 cents in September 1942. The rate for the single Sunday paper remained at 5 cents per copy. These rates are set out in tabular form in our findings as is also a table showing the gross income divided between circulation, advertising, and other income of the Journal, the Tribune, and the Journal-Tribune, for each of the years 1928 to 1945, inclusive. The circulation gross income of the Journal and Tribune combined was $495,231.59 in 1940 and $805,689 in 1941, while for the Journal-Tribune it was $503,486.32 in 1942 and $560,553.83 in 1943.

From the standpoint of advertising, the consolidation was followed by an increase in advertising rates, but a decrease in the amount of linage. The combined gross advertising income of the predecessor companies was $770,800 in 1940 and $723,750 for the 11-month period ended November 30, 1941, while petitioner's gross advertising income was $661,138 for the 11-month period ended October 31, 1942, and $782,000 for the year 1943.

The factor of "other income" was not substantially affected by the consolidation.

Petitioner's greatest benefits, financially, lay in the savings in operating expenses brought about by the consolidation. Indicative of this, for example, is the fact that in 1941 there was a combined gross income from the publication of the Journal and Tribune of $1,224,017.95, expenses of $1,240,169.95, and a net loss of $16,152, while in 1943 petitioner had a gross income of $1,366,112.17 and expenses of $1,137,829.42, allowing a net profit of $228,282.75.

An analysis and comparison of the expense accounts, as set out above, show that while there were increases in operating expenses in some of the departments after the consolidation, they amounted to considerably less than the savings in other departments. The over-all expenses of the Journal and Tribune combined were approximately $1,299,460 in 1940 and $1,240,170 in 1941, while for the Journal-Tribune they were approximately $1,015,572 for 11 months ended October 31, 1942, and $1,137,829 for the fiscal year ended October 31, 1943.

Both parties have submitted reconstructions of base period income purporting to reflect the earnings that petitioner would have had if it had been operating under the consolidated agreement during the base period. These reconstructions differ widely both as to the methods of computation used and the results. A constructive average base period net income of $65,798.34 is computed by respondent while petitioner's reconstruction gives a constructive average base period net income of $364,062.49. In his partial disallowance of petitioner's claims, the respondent had allowed a constructive average base period net income of $104,134.

Respondent's approach is to reconstruct 1939 net income by taking petitioner's 1943 experience and applying thereto certain percentage methods based on selected statistics. The statistics on circulation revenue are based on the experience of a selected group of newspapers said to be comparable to the Journal-Tribune. In his computation, respondent uses the 1939 circulation rates established by petitioner's predecessors. For reconstructing advertising revenue, a discount factor based on indices derived from the volume of retail trade statistics in the Chicago Federal Reserve District is applied to 1943 and 1944 advertising income.

In adjusting "other income" the respondent has taken the approximate average of the actual 1939–1940 experience of petitioner's predecessors. Respondent's reconstructed gross income is circulation $404,722, advertising $520,000, and other income $20,000, making a total gross income of $944,722.

To arrive at net earnings, respondent has applied to gross income a percentage figure based on petitioner's 1943–1944 operating profits, after certain adjustments said to be required to bring petitioner's operation in line, profitwise, with that of other newspaper publishing companies. The percentage figure finally arrived at is 16 per cent, which when applied to the gross income figure $944,722 gives a 1939 operating profit of $151,156. This "operating profit" is then reduced to a "net profit" of $62,156 by the addition of items such as rent, interest, donations, and a portion of the executive salaries which petitioner was obligated to pay under the consolidation agreement.

Applying to the 1939 constructive earnings an index figure of $105.86 respondent determines a constructive average base period net income of $65,798.34 which, in his amended answer and brief, is rounded off to $66,000.

The reconstruction submitted by petitioner is in much more detail. As the starting point, petitioner takes the actual base period experience of the Journal and Tribune year by year and makes adjustments for the changes brought about by the consolidation. There is a complete reconstruction of both the gross income and expenses of each separate department of the business for each of the base period years. Circulation is broken down into daily and Sunday editions, and, further, into carrier and street sales and mail subscriptions. Allowance is made for the shrinkage in daily circulation as well as the increase in Sunday circulation.

Advertising income is reconstructed at the level of the actual advertising revenue of the Journal and Tribune, combined, in each of the base period years, on the theory that any loss of advertising linage due to the consolidation was more than offset by the increase in advertising rates.

"Other income" is reconstructed at the average of petitioner's income for the years 1942, 1943, and 1944, which is below the average of the Journal and Tribune, combined, for the base period years.

In reconstructing expenses, petitioner takes up separately each departmental division of the business and undertakes to reconstruct the base period experience of the predecessors to reflect the changes brought about by the consolidation. The several general departments are editorial, art, photo-engraving, advertising, circulation, mailing and delivery, mechanical (consisting of composing room, stereotyping, and press room), newsprint and ink, building operation, administrative, rentals, and general overhead.

We have reviewed the methods used and the detailed steps taken by each of the parties in arriving at their respective ultimate proposed reconstructions. We find that the comparisons used and the assumptions relied upon are in material respects either inapplicable or inconclusive. No doubt the task of each contending party bordered on the impossible, if precision is the test, because of the complexity of the problem and the broad range in which opinion and judgment may well have varied. Perhaps all that we can offer in our own efforts to reconcile their views is the benefit of a detached approach.

In *Danco Co.*, 17 T. C. 1493 (1952), we said, in part (p. 1498) :

No reconstruction for a concern that was not in operation in the base period years can be absolute. The statute does not contemplate the determination of a figure that can be supported with mathematical exactness. All that it requires is the determination of a fair and just amount to be used as a constructive average base period net income by taxpayers who qualify for relief under the provisions of section 722. The statutory direction is that in determining such an amount regard shall be had to the nature of the taxpayer and the character of its business. This we have done * * *

We think there can be no doubt upon the record that respondent's reconstruction is too low and petitioner's too high for either to be deemed to be a "fair and just amount of normal earnings" within the meaning of section 722.

Upon the basis of our study of the evidence, the proposed reconstructions, and the arguments presented, we have used our judgment in reconciling and integrating the elements material to an ultimate finding and have determined a constructive average base period net income of $35,000 for the 11-month period ended October 31, 1942, for carryover purposes, after application of the variable credit rule (reduced by conceded deductions of abnormal expenses to avoid duplication of credit and deduction) ; $170,000 for the year ended October 31, 1943, after application of the variable credit rule; and $174,000 each for the years ended October 31, 1944, and October 31, 1945.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*